| | United States District Court, Northern District of Illinois | | | |
|---|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | | |
| CASE NUMBER | 01 C 6213 | DATE | 1/7/2003 | |
| CASE TITLE | Anthony Jones vs. Roadway Express, Inc. | | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing held.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the foregoing reasons, Roadway's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

DOCKETED
JAN 08 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY JONES,<br><br>    Plaintiff,<br><br>v.<br><br>ROADWAY EXPRESS, INC.,<br><br>    Defendant. | No. 01 C 6213<br><br>Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Anthony Jones ("Jones"), commenced an action against Defendant, Roadway Express, Inc. ("Roadway"), alleging discrimination in violation of the Americans with Disability Act ("ADA"). Jones claims that Roadway violated the ADA by denying him an accommodation. Also, that when he returned to work after a eight-month leave of absence in May of 2000, he was faced with the requirement that a company-selected doctor examine him and certify his ability to drive safely, as required by law, took about two weeks too long. He further complains that when Roadway's physician certified him as medically qualified to drive, she did so only for a three-month period. Then he experienced a short delay in obtaining his re-certification. Before this Court is Roadway's Motion for Summary Judgment.

## BACKGROUND

Jones is employed by Roadway, a common carrier engaged in the business of hauling freight. (Def.'s 56.1(a)(3) Statement ¶¶ 1-2). Jones has end-stage renal disease, also known as renal or kidney failure. Jones was first diagnosed with renal failure in 1991. (Id., at ¶ 5). Jones undergoes kidney dialysis three times a week for his renal failure. (Id., at ¶ 6). His symptoms he experiences

1 9

related to his renal failure include shortness of breath if he takes in too much fluid and severe itching of his body on occasion due to fluctuating levels of phosphorus and calcium in his system. (Id., at ¶ 7). As long as Jones undergoes regular dialysis, he is able to function "as normal as possible". (Id., at ¶ 8).

Jones describes his limitations as not being able to travel like he used to because he has to plan the travel in advance to schedule his dialysis out-of-town, he cannot swim because of his catheters, he cannot coach sports such as baseball, basketball or football because the dialysis takes up too much of his time, and he cannot play certain sports because of the effect of the dialysis on his bones and because his catheters could accidently come out. His doctors have not told him that he cannot coach sports. (Def.'s 56.1(a)(3) Statement ¶ 9). He also cannot do certain jobs, such as construction work involving the use of a jack hammer. Although he needs to be careful not to disturb his catheter, and his doctor stated that he should check with him regarding jobs that involve physical labor, his doctor has not stated that he cannot do certain jobs. (Id., at ¶ 10). As long as he is on dialysis, he has no physical problems with being a truck driver. (Id., at ¶ 11).

United States Department of Transportation ("DOT") regulations require that truck drivers be certified by a physician as medically qualified to drive a commercial motor vehicle. Jones is familiar with these regulations. (Def.'s 56.1(a)(3) Statement ¶ 12). Drivers may be medically certified for differing periods of time. The longest certification is two years. However, a doctor may certify a driver with a medical condition for as short as three months if the doctor thinks that the condition should be closely monitored. Doctors have discretion in determining the length of the certification period. (Id., at ¶ 13). A truck driver cannot work if he does not have a current medical certification. (Id., at ¶ 18).

Truck drivers at Roadway are responsible for ensuring that their medical certifications are current. If a driver is unable to work because he lacks a current medical certification, he is subject to receiving a warning letter for absenteeism. Warning letters do not result in a loss of pay. (Def.'s 56.1(a)(3) Statement ¶ 14). Roadway designates a clinic or doctor to certify employees. In May 2000, Roadway designated Dr. O'Neill and Partners in Care to certify employees. (Id., at ¶ 15).

The doctors examine the employee to determine if they are medically qualified to drive a commercial motor vehicle. Roadway relies on the professional judgment of the physician conducting the examination to determine whether drivers are medically qualified to drive a commercial motor vehicle. Roadway does not attempt to influence a physician's opinion in this regard. (Def.'s 56.1(a)(3) Statement ¶ 16). Roadway sends employees reminders to renew their certification at least one month before the certification expires. (Id., at ¶ 17). Roadway is strict about ensuring that drivers have current certifications because the certifications are required by DOT regulations and it can get fined for allowing somebody to drive without a current medical card. (Id., at ¶ 19).

Roadway hired Jones as a local truck driver in 1998. (Def.s' 56.1(a)(3) Statement ¶ 20). Jones informed Roadway of his medical condition when "he first walked in the door". (Id., at ¶ 21). He informed Roadway that he could not submit a urine specimen for drug screening due to his inability to produce urine. Although Roadway requires all applicants to provide a urine specimen for testing, it excused Jones from this requirement and hired him. (Id., at ¶ 22).

As a new hire, Jones was "on-call". This meant that he could be called at any time of day or night, any day of the week, and he would be required to report to work within two hours. (Def.'s 56.1(a)(3) Statement ¶ 23). Roadway accommodated Jones's dialysis schedule, notwithstanding

3

his dialysis schedule. According to Jones, Roadway did "a fantastic job ... of working around my schedule. There was no problem." (Id., at ¶ 24). Jones is not claiming that Roadway failed to accommodate his dialysis schedule. (Id., at ¶ 26).

In September 1999, Jones requested and received a leave of absence from Roadway to receive treatment in Kansas City, Missouri, for his kidney problems. (Def.'s 56.1(a)(3) Statement ¶ 27). In May 2000, he sought to return to work from his leave of absence. He was not scheduled to work on a specified day. (Id., at ¶ 28).

Roadway has a policy that if an employee is off work for more than twenty-nine days, the employee must see the company's doctor to be reinstated back to work. This is a standard policy applied to all employees. (Def.'s 56.1(a)(3) Statement ¶ 29). Pursuant to the policy, Jones could not be scheduled to return to work until he had his medical certification. (Id., at ¶ 30). Roadway told Jones to go to the Partners in Care Clinic to get his medical certification and gave him the DOT medical form that needed to be completed. Nobody at Roadway told Jones specifically to go to Dr. O'Neill. (Id., at ¶ 31).

Jones went to Partners in Care and saw Dr. O'Neill a few days after Roadway referred him to that clinic. (Def.'s 56.1(a)(3) Statement ¶ 33). This was the first time that Jones saw Dr. O'Neill. (Id., at ¶ 34). O'Neill told Jones that, because he was a kidney patient, she would need to see some blood work and lab reports to make sure that he was qualified to drive. (Id., at ¶ 35). Jones told Dr. O'Neill that his lab reports were "none of [her] business" and that she was "overstepping [her] boundaries" and that she was not a specialist. (Id., at ¶ 36). Jones believes that he "pissed her off" because she then told him that she would not sign his card. (Id., at ¶ 37). Jones became very upset with O'Neill and "things started to get ugly". He became "irate" and eventually yelled at the doctor.

4

(Id., at ¶ 38). Jones told Dr. O'Neill to talk to his doctor, Dr. Cline. Jones gave Dr. O'Neill Dr. Cline's name and telephone number at some point on or after this first visit. (Id., at ¶ 39). Jones did not give Dr. O'Neill any of his medical records at his first visit. (Id., at ¶ 44).

When Dr. O'Neill contacted Dr. Cline, he informed her that Jones was a new patient, that he was just taking over his case, and that he did not know much about Jones. (Def.'s 56.1(a)(3) Statement ¶ 40). Dr. Cline had told Jones that he could not provide Dr. O'Neill with a letter stating that Jones could work because he had just taken over his case. Dr. Cline told Jones that he would have to review all of the facts first and consult with Jones's nephrologist in Kansas City. (Id., at ¶ 42). Eventually, Dr. Cline did consult with the doctors in Kansas City and put his determination regarding Jones' ability to work in writing. Dr O'Neill was not satisfied with that letter. (Id., at ¶ 43). Dr. Cline's office also eventually sent Jones's blood lab history to Dr. O'Neill. (Id., at ¶ 49).

Dr. O'Neill, or somebody from her office, tried to get information about Jones directly from Jones's doctor in Kansas City. (Def.'s 56.1(a)(3) Statement ¶ 47). The doctor in Kansas City informed Dr. O'Neill that Jones was medically qualified to drive while he was in Kansas City. (Id., at ¶ 48). Dr. O'Neill eventually obtained information about Jones's condition from his specialist. (Id., at ¶ 50).

Jones believes that Dr. O'Neill could have obtained the information from his specialist the first day she saw him. However, he admitted that it could take a few days to get that information. (Def.'s 56.1(a)(3) Statement ¶ 51). Jones believes that Dr. O'Neill was on a mission to keep him from working and avoid certifying him because he "never had [to] go through this" in the past. (Id., at ¶ 52).

On May 17, 2000, Dr. O'Neill issued a certification for Jones with no restrictions. The

certification was effective for three months, until August 17, 2000. (Def.'s 56.1(a)(3) Statement ¶ 71). Jones began working for Roadway again on May 17, 2000. (Id., at ¶ 53). When Jones was trying to get his certification in May 2000, he spoke with Roadway personnel. Roadway asked Jones why he was giving the doctors a hard time and told him that Roadway was doing everything possible to get Jones re-certified. (Id., at ¶ 57). Jones thought that Roadway was hiding behind the doctor. (Id., at ¶ 59). Nobody at Roadway ever told Jones that they did not want him to return to work. (Id., at ¶ 60).

Dr. O'Neill never told Jones that she thought he should not work. (Def.'s 56.1(a)(3) Statement ¶ 61). Dr. O'Neill's main concern was getting additional documentation about Jones's condition. (Id., at ¶ 62). Nobody at Partners in Care or at Roadway told Jones that the cause of the delay in his certification was for any reason other than to get additional documentation from Jones's specialist. (Id., at ¶ 63). Although Dr. O'Neill received information from Jones's doctors in Kansas City, she told Jones that the information was not current enough because Jones was under the care of a different doctor. Dr. O'Neill eventually received current information from Dr. Cline. (Id., at ¶ 64). Nobody told Jones that he could not come back to work if he did not have his certificate by a specific date in May 2000. Nobody told Jones that he would be allowed to return to work the same day that he was re-certified, and Jones did not talk to anyone at Roadway about an exact day he would return to work. (Id., at ¶ 65).

Sometime before his certification expired on August 17, 2000, someone from Roadway told Jones that, according to DOT policy, if a doctor issued a certification with a three-month restriction, the driver had to go back to that same doctor to get re-certified when it expired. (Def.'s 56.1(a)(3) Statement ¶ 81). Jones went to Partners in Care on August 8th or 9th to get re-certified. He did not

see Dr. O'Neill but saw a different doctor, who told him that he could not give him a DOT physical. (Id., at ¶ 84). Jones did not see Dr. O'Neill again because she wanted his blood work from May through August 2000 before re-certifying him. Jones's doctors stated that she did not need the blood work. (Id., at ¶ 85).

On August 16, 2000, Jones saw Dr. Deshaies at Partners in Care. Dr. Deshaies certified Jones for an additional three months. (Def.'s 56.1(a)(3) Statement ¶ 86). Jones could not work between August 17 and August 20, 2000, because he did not have a current medical certification. Jones received a disciplinary warning for absenteeism for missing work. (Id., at ¶ 87). As a result, Jones was not paid for four days that he could not work because his medical certification had lapsed. Jones was not re-certified until August 22, 2000. Thereafter, Jones returned to work. (Id., at ¶ 88). Jones has not had any problems or delays in receiving his certification since August 2000. (Id., at ¶ 92).

On October 26, 2000, Jones received a written warning for absenteeism. (Def.'s 56.1(a)(3) Statement ¶ 93). Jones was scheduled to work on October 26, 2000. He did not feel well after his dialysis session that day and called in sick. Jones spoke with the driver foreman. (Id., at ¶ 94). Jones did not mention the October 26, 2000 warning in his Equal Employment Opportunity Commission ("EEOC") charge and does not recall speaking with the EEOC investigator regarding the warning. When Jones stated in his charge that he believed he was discriminated against based on his disability, he was not referring to anything other than the May 2000 and August 2000 certification incidents. (Id., at ¶ 95).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and

7

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Jones failed to respond to Roadway's Motion for Summary Judgment. However, the motion will only be granted if Roadway can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Johnson v. Gudmundson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is a disabled person "who ... can perform the essential functions" of his job, including those who can do so only "with ... reasonable accommodation." 42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that he is a "qualified individual with a disability".

A disability is a "physical or mental impairment that substantially limits one or more ... major life activities." 42 U.S.C. § 12102(2). The determination of whether a person has a disability under the ADA is made on an individualized case-by-case basis. *Bryne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir. 1992). This determination is made through a three-step process: (1) whether the individual suffers from a "physical or mental impairment", (2) whether the life activity on which the individual relies upon is a "major life" activity, and (3) whether the impairment "substantially limits"

8

that major life activity. See *Bragdon v. Abbott*, 524 U.S. 624, 531 (1998) (*Bragdon*).

The parties do not dispute that Jones's kidney failure constitutes a physical impairment.

Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, learning, and working. This list is illustrative not exhaustive. *See Bragdon*, 524 U.S. at 638-39; 45 C.F.R. § 84.3.(j)(2)(ii) (1999).

The above undisputed facts establish that Jones's kidney failure does not limit a "major life activity." Jones is able to care for himself, perform manual tasks, walk, see, hear, speak, learn; and he can work as a truck driver.

Furthermore, Jones's impairment does not significantly restrict any major life activity. The ADA regulations define "substantially limited" as: "[s]ignificantly restricted to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.2(j)(1)(ii) (1999).

Three factors are analyzed for determining whether a person's impairment substantially limits a major life activity: (1) the nature and severity of the impairment, (2) the duration of the impairment, and (3) the permanent or long-term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Furnish v. SVY Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). The positive and negative effects of any corrective measures must also be taken into account when determining whether a person is substantially limited in a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999).

Here, Jones concedes that, as long as he maintains his dialysis schedule, there is no reason that he cannot work as a truck driver. Jones has restricted his involvement in, and in coaching,

certain sports; however, such limitations would not constitute a substantial limitation on a major life activity. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 951 (7th Cir. 2000).

Lastly, Jones was not otherwise qualified to be a truck driver during the times in May and August 2000 when he did not have a valid DOT medical certification. To be a "qualified individual", the plaintiff must establish that: (1) he possesses the prerequisites for the job and (2) he can perform the essential functions of the job with or without reasonable accommodation. *See Emerson v. Northern States Power Co.*, 256 F.3d 506, 513 (7th Cir. 2001) (*Emerson*). The determination whether an individual is qualified is made at the time of the employment decision. *See Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998).

Here, Jones did not have a valid certification to work as truck driver, as required by the DOT, during May and August 2000[1] that forms the basis of his complaint. Accordingly, he was not qualified to work as a truck driver during these time periods. *See Bay v. Cassens Transport Co.*, 212 F.3d 969, 974-75 (7th Cir. 2000) (truck driver was not qualified under the ADA until he obtained his medical re-certification) (*Bay*).

Assuming *argumendo* that Jones could establish a *prima facie* case of discrimination, Jones's failure to accommodate claim still fails because he never made a good faith request for a reasonable accommodation, and his request that Roadway interfere with the doctor's responsibility was not reasonable.

The ADA requires employers to provide "reasonable accommodations to the known physical

---

[1] Jones's allegation relating to October 2000 was not included in his EEOC charge and is not reasonably related to the allegations included in the EEOC charge. Accordingly, the October 2000 allegation cannot be the basis for Jones's discrimination claim. *See Green v. National Steel Corp.*, 197 F.3d 894, 897-98 (7th Cir. 1999); *Luna v. Walgreens*, 888 F. Supp. 87, 88 (N.D. Ill. 1995).

or mental limitations" of a qualified disabled individual. 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodations" include job restructuring, modified work schedules, reassignment, and modification of equipment, examinations or policies. 42 U.S.C. § 12111(9). However, an employer does not have to provide an employee the accommodation he requests. *See Nicosia v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 951 (7th Cir. 2001).

In the instant case, the only "accommodation" Jones sought was to have Roadway put pressure on Dr. O'Neill to certify him because nothing but the lack of certification prevented Jones from working. This request for elimination of a barrier outside the work environment that included interfering with a doctor's professional opinion would not be reasonable. *See Bay*, 212 F.3d at 974-75.

## CONCLUSION

For the foregoing reasons, Roadway's Motion for Summary Judgment is granted.

Dated: January 7, 2002

JOHN W. DARRAH
United States District Judge

11